## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CRIMINAL NO. 00-375 (RWR)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MADHATTA ASAGAL HAIPE,** | ) | |
| **also known as HATTA HAIPE,** | ) | |
| **also known as USTADZ MADHATTA HAIPE,** | ) | |
| **also known as COMMANDER HAIPE,** | ) | |
| **also known as ABU ABDULLAH AZIS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____ )

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America respectfully submits the following sentencing memorandum in the above-referenced case.

## I.     Introduction

Fifteen years ago, defendant Haipe preyed upon 16 innocent people who were enjoying a family outing at a popular tourist location in the southern Philippines. His group of heavily armed men surrounded the horrified tourists and took them hostage, marching them up a rugged mountainside. Defendant Haipe lectured the hostages about the group's cause, set ransom amounts for the hostages' release, and released three of the female hostages (along with a male guide) to go obtain the ransom money, threatening death to the hostages if his demands were not met. He ignored pleas to release the six children whom he was holding hostage. Instead, he kept all of the children hostage, making two mothers endure the agony of leaving their children behind in captivity while they desperately sought to garner the ransom amount demanded by the defendant to save the lives of all of the hostages, including their husbands and their children. Although the hostage taking spanned only five days on the calendar, and all of the hostages were

released without any permanent physical harm, the emotional scars of this crime have lasted a lifetime for the victims.  The victim impact statements (VISs) submitted to the Court outline in intensely personal detail the enormous magnitude of this crime.  Each VIS eloquently demonstrates how the pain the defendant inflicted on the victims is felt to this day.

Defendant Haipe committed these acts as a founding member and the second-in-command of a notorious terrorist organization, Al-Harakat Al-Islamiyyah, also known as the Abu Sayyaf Group (ASG).  The written charter of Al-Harakat Al-Islamiyyah (attached as **Exhibit A**), to which defendant Haipe is one of nine signatories, states, among other things, that the purpose of the group is either to establish an Islamic government in the southern Philippines or to "reach Martyrdom in Allah's way"; and that the group considers jihad (holy war) "as the only method and alternative to stop and root out aggression, tyranny, injustice, and oppression."  At the time that defendant Haipe committed the crimes to which he pleaded guilty, the Amir of Al-Harakat Al-Islamiyyah had directed that members of the group engage in kidnappings for ransom in order to raise funds for the group and to raise the public's awareness of the group's purpose.

As with the victims, the United States government has not forgotten this crime.  We now seek a sentence consistent with the factors set forth in 18 U.S.C. § 3553(a) that will punish the defendant appropriately, serve as a deterrence for those who seek to harm Americans abroad, and bring some measure of closure and justice for the long-suffering victims in this case.  As discussed below, a proper calculation of the Sentencing Guidelines indicates a sentence of life imprisonment.  However, in reaching a plea agreement in this case, the government took into consideration, among other things, that the defendant was accepting responsibility for his acts, that he was sparing the victims the ordeal of a trial, that he was saving the government and the

court the resources entailed in a trial, that the defendant's active involvement in the ASG largely ended more than a decade ago,[1] and that the crime ended after five days and did not result in serious physical harm to the victims.  As a result, as part of the plea agreement, the government has promised that it will not seek a sentence more than 25 years in prison.  The defendant has already received the benefit of his bargain as part of the plea.  He should not receive any further credit for the same factors which led the government to limit its sentencing allocution in this case.  Instead, the Court should sentence the defendant to 25 years of incarceration under the totality of the circumstances of this case.[2]

## II.    Summary of the Facts

At about noon on December 27, 1995, approximately forty (40) members of the ASG, garbed in military fatigues and heavily armed, abducted sixteen (16) individuals from the Trankini Falls area near Lake Sebu, in southern Mindanao Island, Republic of the Philippines, a remote and heavily forested elevated area.  Affidavit of Nelson Roque in Support of Request for Extradition (hereinafter, Nelson Roque Affidavit), attached as **Exhibit B**, ¶¶ 3-4;  Factual Proffer in Support of Guilty Plea (hereinafter Factual Proffer) ¶¶ 4-5.  The kidnapers were operating under the leadership of defendant Madhatta Asagal Haipe.  Affidavit of Helen Roque in Support of Request for Extradition (hereinafter, Helen Roque Affidavit), attached as **Exhibit C**, ¶¶ 8-10; Factual Proffer ¶¶ 14-18, 24-26.  Six of these hostages were children; four of the hostages (Helen Roque, Bien-Elize Noelle Roque, Elenita Dayao and Gloria San Gabriel) were U.S. citizens and

---

[1]    The defendant claims to have left the ASG in approximately 1997.  He did, however, act as a negotiator during another hostage taking by the ASG of a large group of western tourists kidnapped from a dive resort in Sipadan, Malaysia in 2000.

[2]    *See also* Government's Sentencing Memorandum Supplement, filed under seal this date.

a fifth (Nelson Roque) was a U.S. permanent resident alien. Affidavit of Ripley McGuinn in Support of Request for Extradition (hereinafter, McGuinn Affidavit), attached as **Exhibit D**, ¶ 7; Factual Proffer ¶¶ 6-7.

The kidnaping began when the kidnapers descended on the hostages, shouting "dapa," which in Tagalog, the national language of the Philippines, means "hit the ground" or "get down." Helen Roque Affidavit ¶ 4; Factual Proffer ¶ 8. During the initial few minutes of the kidnaping, two of the adult male hostages were struck by unidentified kidnapers with rifle butts. Helen Roque Affidavit ¶ 5; Factual Proffer ¶ 9. The kidnapers tied the hands of some of the adult hostages' hands behind their backs and tied rope around the necks of some of the adult male hostages in order to prevent their escape. Nelson Roque Affidavit ¶ 4; Factual Proffer ¶ 10. The kidnapers ordered the hostages to begin marching up the mountainside. Nelson Roque Affidavit ¶ 4. Most of the hostages were either barefoot or wearing flimsy thongs on their feet, and the terrain over which they were forced to march was treacherous. During the initial phases of the kidnaping, the kidnapers took purses, jewelry, cameras, personal papers (including an address book and various identification papers), money, comprised of both Filipino Pesos and United States currency, and other valuables from the hostages. Helen Roque Affidavit ¶ 6; Factual Proffer ¶ 11. The kidnapers also threatened to kill all the hostages if any hostage attempted to escape. Helen Roque Affidavit ¶ 6; Factual Proffer ¶ 13. In addition, the kidnapers threatened to use a particular knife carried by one of the kidnapers (described by the hostages as approximately two feet long, with a very sharp blade in the shape of a semi-circle) to behead one of the victims. Nelson Roque Affidavit ¶ 5; Factual Proffer ¶ 13.

After a few hours of marching, the group stopped at a clearing, where defendant Haipe

4

appeared and sat on a rock imperiously.  Nelson Roque Affidavit ¶ 8; Factual Proffer ¶ 14.

Haipe met with several of the hostages individually (including then 11-year-old, Bien-Elize

Roque), questioning them concerning their citizenship, residence, family affiliation, employment

and financial resources.  Factual Proffer ¶ 14.  Haipe informed the hostages that they were part of

the "oppression" (presumably of Muslims in the Philippines) and that they had been kidnaped for

ransom.  Nelson Roque Affidavit ¶ 6; Factual Proffer ¶ 14.  Haipe announced that the ransom for

the hostages from the United States (meaning the Roque family and Elenita Dayao) would be

1,000,000 Filipino Pesos (approximately $38,000 U.S. dollars) and the ransom for the Filipino

hostages would be 500,000 Filipino Pesos (approximately $19,000 U.S. dollars).  Nelson Roque

Affidavit ¶ 7; Factual Proffer ¶ 15.  Haipe decided to release three adult female hostages – U.S.

citizens Helen Roque and Elenita Dayao and a Filipino woman (hereinafter "PH-1 ") – in order to

obtain the demanded ransom, along with a male Filipino victim, who was to serve as their driver.

Helen Roque Affidavit ¶ 10; Factual Proffer ¶ 17.  The driver's 11-year-old son was kept by

Haipe and the kidnapers as a hostage.  Haipe set a deadline for payment of the ransom by the

following day, December 28, 1995.  Helen Roque Affidavit ¶ 10; Factual Proffer ¶ 15.  Prior to

releasing these four hostages, defendant Haipe warned them not to report the kidnaping to

government or military authorities or to the media and told them that any military intervention

would result in the killing of the remaining hostages.  Helen Roque Affidavit ¶ 10; Factual

Proffer ¶ 16.

After the four hostages were released, Haipe and the kidnapers forced the remaining

hostages to continue marching up the mountainside, until, around dark, they reached a camp,

where they remained for the night.  Affidavit of Nelson Roque ¶ 8; Factual Proffer ¶ 18.  While

in the camp, the kidnapers kept the hostages under the surveillance of armed guards.  Affidavit of

Nelson Roque ¶ 8; Factual Proffer ¶ 18.  On the second day of the kidnaping, December 28,

1995, the hostages were moved to a second camp, higher in the mountains, where they remained,

under armed surveillance, until they were released on December 31, 1995.  Affidavit of Nelson

Roque ¶ 8; Factual Proffer ¶ 26.

At some point between December 28, 1995, and December 31, 1995, some of the

kidnapers began playing with a video camera that they had seized from Nelson Roque.  Nelson

Roque Affidavit ¶ 13.  Roque showed the kidnapers how to use the equipment and, subsequently,

the kidnapers filmed various brief scenes from the camp in which the hostages were being held –

including footage of the hostages huddled together under a single makeshift tent and footage of

various kidnapers holding various weapons.[3]  When the kidnaping ended, the kidnapers gave the

film from the camera back to Nelson Roque as a "souvenir."  Id.  Because of the manner in

which it was made, the film is out of sequence, but there is clear footage of the kidnapers

carrying what appears to be a 90mm Recoilless Rifle (which is a long, wide tube-like weapon,

carried over the shoulder and used for firing anti-tank mortars).  The video also shows other

kidnapers (each either unidentified or now-deceased) holding the following types of weapons:

M-14s, M-16s (Armalite rifles), a Browning Automatic Rifle (with a magazine that is not

typically associated with a BAR), and a pistol.  Haipe is not shown in the videotape.

During their captivity, some of the adult male hostages engaged in ongoing dialogues

with Haipe and some of the other kidnapers.  At a fairly early stage in the kidnaping, Haipe asked

---

[3]        A few still photos derived from that footage are attached as **Exhibit E**.  At the sentencing proceeding,
the government intends to introduce as an exhibit a CD containing excerpts of that footage and to play those excerpts
in court.

one of the male Filipino hostages (hereinafter "PH-2") whether he (PH-2) remembered Haipe.

McGuinn Affidavit ¶ 11.  Haipe informed PH-2 that he (PH-2) had assisted Haipe when Haipe

had gone to City Hall seeking a permit.  Later during the kidnaping, Haipe introduced himself to

PH-2 by name ("Hatta Haipe") and said that he was the Secretary General of the Abu Sayyaf,

with responsibility for kidnapings and other activities in southern Mindanao.  Id.  Prior to

releasing the hostages, defendant Haipe provided PH-2 with an exemplar of his (Haipe's)

signature, so that PH-2 would be able to authenticate any future correspondence.  Id.

Nelson Roque made a conscious effort to try to "befriend" Haipe during the kidnaping, in

order to try to prevent Haipe from having him and his family killed.  Nelson Roque Affidavit

¶ 10.  Haipe lectured Roque on history, contending that the government had taken the land from

the Muslims centuries ago and that Haipe and his group were fighting to get the land back.  Id.

Haipe introduced himself by name ("Commander Haipe") to Roque.  Id. ¶ 6.  Haipe also

informed Roque that he (Haipe) had gone back and forth to Libya to study and that he had taught

at one of the universities in the local area (i.e., in Mindanao) and that he had studied Islamic

Studies.  Id.

Meanwhile, after their release, Helen Roque, Elenita Dayao and PH-1 contacted various

family members and friends in order to quickly raise the ransom money.  Helen Roque Affidavit

at ¶ 11; Factual Proffer ¶ 19.  On December 28, 1995, one million pesos were wired from Metro

Bank in Manila to Metro Bank in General Santos City for Helen Roque.  Helen Roque Affidavit

at ¶ 11; Factual Proffer ¶ 19.   Likewise, PH-1 managed to raise almost 250,000 pesos for

payment of the ransom.  Both families essentially turned the money over to the control of

Rosalita Nunez, the Mayor of General Santos City and a former professor at Mindanao State

University, who initiated negotiations with Haipe.  Beginning about December 28, 1995, Mayor

Nunez began a correspondence with Haipe, in which she wrote a letter trying to appear

sympathetic to his cause in order to win his trust, and Haipe wrote back one or more letters in

which he made various demands, including ransom demands.  Factual Proffer ¶ 21.  None of

these letters has ever been recovered.  The letters were delivered by intermediaries – primarily

two Muslims who knew Haipe.  Id. ¶ 22.  These same intermediaries were responsible for

delivering the ransom money to Haipe.  The sum of money that was received by the co-

conspirators by December 31, 1995 was not the full amount of the demanded ransom.  Id. ¶ 23.

Defendant Haipe and his co-conspirators accepted the lesser amount and released the hostages on

the condition that the remaining ransom be paid later along with a commitment by the local

government to provide certain services to the local Muslim community.  Id.  Those services

included providing financial support for existing Islamic schools in General Santos City,

providing land in General Santos City in order to establish a cemetery for Muslims, a

commitment to hire more Muslim people for government jobs, and a promise to discontinue

discriminatory practices against Muslims who were seeking to acquire real property.  Id.

Nonetheless, on December 31, 1995, Haipe and the other kidnapers released the remaining

hostages.

## III.    Sentencing Enhancement Under USSG § 3A1.4(a)

The Presentence Report's Offense Level Computation includes a 12-level adjustment

under United States Sentencing Guidelines ("Guidelines" or "USSG") § 3A1.4(a) (1995).  The

defense has objected to this adjustment.  The government believes this adjustment is applicable

under the facts of this case.

The 1995 version of USSG § 3A1.4 provides for a 12-level sentencing enhancement "[i]f the offense is a felony that involved, or was intended to promote, international terrorism."  The Commentary to USSG § 3A1.4 indicates that the term "international terrorism" is defined at 18 U.S.C. § 2331.  In relevant part, that provision defines "international terrorism" as violent acts or acts dangerous to human life that "appear to be intended – (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by assassination or kidnapping."[4]  18 U.S.C. § 2331(1)(B).

Defendant Haipe's conduct handily meets all three definitions of "international terrorism."   Defendant has, under oath, agreed to the aforementioned Factual Proffer which notes the following:

- In the written charter for Al-Harakat Al-Islamiyyah (**Exhibit A**), defendant Haipe is one of only nine signatories.  Factual Proffer ¶ 1.

- The plain words of the charter state the purpose of the group is, among other things, to establish an Islamic government in the southern Philippines. Factual Proffer ¶ 1.

- At the time of the crime, defendant Haipe held the second ranked position in the organization, next to the Amir. Factual Proffer ¶ 2.

- At the time of the crime, the Amir had directed members of the group to engage in kidnappings for ransom in order to raise funds for the group and to raise the public's awareness of the group's purpose.  Factual Proffer ¶ 3.

---

[4]    Pursuant to 18 U.S.C. § 2331(1)(C), the term "international terrorism" means activities that "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries . . ."  This condition is clearly met here, given that the offense occurred in the Philippines.

- Defendant Haipe informed the hostages that they were part of the "oppression" and that they had been kidnaped for ransom.  Factual Proffer ¶ 14.

- After receiving a ransom amount that was less than the full amount demanded, defendant Haipe and his co-conspirators accepted the lesser amount and released the remaining hostages on the condition that the remaining ransom be paid later along with a commitment by the local government to provide certain services to the local Muslim community.  Those services included providing financial support for existing Islamic schools in General Santos City, providing land in General Santos City in order to establish a cemetery for Muslims, a commitment to hire more Muslim people for government jobs, and a promise to discontinue discriminatory practices against Muslims who were seeking to acquire real property.  Factual Proffer ¶ 23.

In addition, as discussed in Paragraphs 28 and 29 of the Factual Proffer, more than six months after the hostages were released, defendant Haipe wrote two letters demanding that the remaining unpaid ransom be paid by one of the former hostages (PH-2) and by Mayor Nunez. The first letter (attached as **Exhibit F**), dated July 10, 1996, was written by defendant Haipe on stationary containing the same symbol that appears on the charter of Al-Harakat Al-Islamiyyah. The letter was addressed to PH-2, a former hostage to whom defendant Haipe had given an exemplar of defendant Haipe's signature prior to the hostage's release from captivity.  See Factual Proffer ¶ 24.  The letter read as follows (all punctuation and spelling is shown as it appears in the original):

Greetings of Peace,

Think not that we forgot already your betrayed commitment to us, remember that you are now under our reconnaissance, however I will give the last chance to continue your good relation to us through paying the amount which you have committed.

Pay us 100,000.00 [Philippine pesos] only in installment basis
instead of 500,000.00 [Philippine pesos], however the first
payment should be half of the said amount, you are given 2 weeks
to accomplish the (said amount) (First payment), just give it to our
bearer.  We do not recognize [name of one of the Muslim
emissaries involved in delivering the ransom money during the
hostage taking].

Anticipating your compliance.

Your friend,
[Arabic signature]
Ustadz Hatta

The second letter (attached as **Exhibit G**), dated July 10, 1996, was written by defendant

Haipe on stationary containing the same symbol that appears on the charter of Al-Harakat Al-

Islamiyyah.  The second letter was addressed Mayor Nunez, who had been involved in the

negotiations for the release of the hostages.  The letter read as follows (all punctuation and

spelling is shown as it appears in the original):

Greetings of Peace,

Hoping that you still remember a friend of yours, Ustadz Hatta,
whom you promised then betrayed.  You might have in mind that
since I am far away I can execute nothing in your area of
responsibility, remember that I know every corner and most of the
secrets in your city, you will suffer the consiquences if you will not
comply your commitment.  We are going to give you 2 weeks to
produce 50,000.00 [Philippine pesos], then 5,000.00 [Philippine
pesos] succeeding month (monthly basis) starting August 1996.
Hand the amount to the bearer of this letter.  I don't recognize the
interference of [name of one of the Muslim emissaries involved in
delivering the ransom money during the hostage taking], no
bargain is being recognize.  In case of failure, we will execute
programs according to our plans.

Anticipating your compliance.

Your friend,

11

Ustadz Hatta

> Note:
> This is the signature known to
> [name of Filipino hostage]
> [Arabic signature]

These letters not only showed defendant Haipe's continued affiliation with the

Al-Harakat Al-Islamiyyah, but his unrelenting efforts to achieve its organizational goals.

Finally, there is further evidence that defendant Haipe sought to engage in acts that constituted

"international terrorism" from his contemporaneous public statements, aired on a Philippines

television station, made at roughly the same time that he was sending the two letters referenced

above.[5]  In one of those interviews, surrounded by numerous fellow ASG members, wearing his

guerilla garb, defendant Haipe stated, "[w]e are here to fight to the last drop of our blood, until

finally we can establish an independent Islamic State."

## IV.    A Downward Departure Is Not Warranted Under United States v. Smith

The Presentence Investigation Report (PSR) suggests that a downward departure under

the D.C. Circuit's decision in United States v. Smith, 27 F.3d 649 (D.C. Cir. 1994) to account for

any severe aspects of defendant Haipe's conditions of confinement that are a result of his status

as a deportable alien might be warranted.  PSR ¶ 154.  Under Smith, however, a defendant must

demonstrate that he would necessarily and in fact be subject to substantially more severe

conditions for a substantial period of his sentence than he would if he were not subject to

deportation.  27 F.3d at 655.  As stated in Smith, any departure, including one based on

---

[5]        Attached as **Exhibit H** is a still photo derived from a television interview of defendant Haipe, circa 1996.  At the sentencing proceeding, the government intends to introduce as an exhibit a CD containing excerpts of these public statements.

deportability, should be granted only when the greater severity is undeserved, solely on account

of his alienage, and should be "highly infrequent." Id. There is no evidence that this defendant

will suffer more severe conditions of incarceration for a substantial part of his sentence simply

because of his status as a deportable alien. And even if there were some indication that his

conditions would be more severe, "a court confident that the status will lead to worse conditions

should depart only when persuaded that the greater severity is undeserved." Id. at 655. In this

case, defendant Haipe is deserving of substantial punishment. For these reasons, this Court

should thus decline to impose a downward departure based on United States v. Smith.

**V.    The Length of the Defendant's Custody in this Case**

In the defense's Receipt and Acknowledgment of Presentence Investigation Report

(Defense Receipt and Acknowledgment), the defense argues that "Mr. Haipe was arrested in

Malaysia on or about June 21, 2006, in connection with the instant offense " and that "Mr. Haipe

has been continuously held without bond in connection with the instant case since about June 21,

2006." Defense Receipt and Acknowledgment p.1. This is not accurate. The Malaysians have

informed the United States that the defendant was arrested on June 27, 2006, pursuant to

Malaysia's Internal Security Act 1960.[6] Although the United States subsequently made a request

to Malaysia for the provisional arrest of the defendant, that request was rejected by Malaysia. As

a result, the defendant was not held at the request of the United States until he was arrested in the

Philippines on May 21, 2009. That arrest was conducted by the Philippine National Bureau of

Investigation, pursuant to the provisional arrest request of the United States. The defendant was

---

[6]    Attached as **Exhibit I** are excerpts of the Malaysian Internal Security Act 1960. Section 8 of that Act sets forth the basis for detention and Section 73 discusses police arrest powers. The Court should note that the Act is aimed at detention and rehabilitation and not at criminal punishment or extradition.

held pursuant to that request, and to the subsequent extradition request by the United States, until August 27, 2009, when he was extradited to the United States, having waived further extradition proceedings and agreed to his surrender. The defendant was arrested by the Federal Bureau of Investigation upon his arrival in Honolulu, Hawaii, on August 27, 2009, and transported immediately to the District of Columbia. He has been held without bond since his initial court appearance in this matter on August 28, 2009.

## VI.    Victim Impact Statement Information

It is only by reading the numerous VISs submitted to the Court that one can begin to gain a real sense of the damage caused by the defendant. These statements express best the horror of this crime, both then and now.

### A.    The Physical and Emotional Brutality of the Crime

The crime occurred in a remote, elevated, and heavily forested area. The kidnapers forced the hostages to march through this unforgiving terrain. It was physically brutal. The omnipresent guns and the uncertainty of whether they would live or die made this a nightmare come true for the victims.

### VIS Excerpt, Helen Roque[7]

> I felt bullied because we were helpless. They preyed on innocent men, women and children who could not fight back with their guns, bazookas and knives. I felt very angry because it was an unfair fight. They threatened to kill us and we had thoughts of being raped. I felt horrible and helpless when they tied my husband's neck and his hands around his back like an animal

---

[7]    Helen Roque was 36 years old at the time of the crime. She was born in southern Mindanao, arrived in the United States in 1974, became a naturalized U.S. citizen in 1979, and was a U.S. citizen at the time she was a hostage. She is the wife of Nelson Roque and the mother of Bien-Elize, both also hostages. She currently lives in the United States.

especially when I saw my husband's pale face. I was afraid for my daughter's life. I felt helpless when she had to walk miles and miles barefooted in the mountains and got bitten by big ants, leeches and worms and I could not help her. I was angry when one of Haipe's leader called my daughter to talk to her and asked her questions when there were 16 of us there and mostly adults subjecting my daughter to more fear. I was angry the Haipe's leader called my husband afterwards and forced him to admit that he was a rich Chinese businessman, then, when we finally met Haipe, he again talked to my husband. When negotiations were happening, Haipe said that they will release everyone except my daughter and my husband in order to get the ransom money that they were demanding. Why my family?

When we were released to get the ransom money and I was separated from my husband and my daughter, I thought of dying thinking that I will never see my family again. I was dying thinking of my daughter and my husband not eating and sleeping in the mountains under a knife and guns. I was dying thinking that they were hurt. . . .

I was seven months pregnant, and I thought I had leptospirosis (my left leg was swollen up to the knee) I thought was due to the leeches and the muddy areas we were made to go round and round on the first day of our captivity and was worried sick my baby will not be normal.

### VIS Excerpt, Gloria Tagarro Galindez[8]

While being held captive by their group, I felt so hopeless and helpless thinking that the place we were being kept will be my family's and my friends' burial ground. Every evening that Mr. Madhatta Haipe appears telling us we will be released the following day brought so much fear in me that my then husband Noel D. San Gabriel will be the first to be killed and us women will be raped and then killed as well.

---

[8]    At the time of the crime, Ms. Tagarro Galindez was known as Gloria San Gabriel and was 35 years old. She was born in southern Mindanao, arrived in the United States in October 1987, and was a U.S. citizen at the time she was a hostage.  She has two children, Chrys Lyle San Gabriel (who was a hostage), born on 8/10/86, and Geofos Galindez San Gabriel (U.S. citizen), born on 8/3/96 (she was pregnant at the time she was taken hostage).  Prior to the crime, Ms. Tagarro Galindez had been lifelong friends with Helen Roque and had lived in Helen's house prior to the kidnaping.

**VIS Excerpt, V.L.**[9]

More than fourteen (14) years had passed, however, ill effects of the unfortunate incident on December 27, 1995 still haunts my family. As a mother, the trauma it brought me can never be quantified nor qualified. . . .  As one of the four (4) persons first released, the next several days to the date of release of the other victims were unbearable. The thought of losing my husband and children, not to mention my relatives and friends, almost drove me to a nervous breakdown and only my faith in God and the prayers and support of my other relatives and friends helped me to survive. I can not even make myself eat food. The choice I had to make when I was about to be among the first to be released haunted me for so long; I haggled for the release of only the four (4) young victims (ages 7 to 11), two (2) of whom were my younger children, excluding my eldest, Joy who was already then 19 years of age. I was hoping the youngsters will be released as I felt they can not withstand the circumstances, the weather and all. How can a mother forgive herself for that choice.

How can I forget the wails of my only son who was begging for him to go with me? How can one let go of a husband who was earlier butted with a gun and her children in a wilderness, surrounded by a hostile and armed group of about thirty (30) or so, sans sufficient food and shelter? How can one survive the thought that she was leaving her 7 year old and youngest child who was suffering from acute asthma? Words are not enough to describe the trauma I experienced from said hostage ordeal.

## B.    The Aftermath of the Crime - Permanent Trauma

The crime took place over a relatively brief period of time.  The trauma inflicted by the defendant on the victims, however, has lasted a lifetime.  A common thread throughout the victim impact statements was the feeling of helplessness, vulnerability, and paranoia that continues to this day.  It is tragic how this five days of captivity served to alter the psyches and lives of so many.

---

[9]    V.L. was 38 years old at the time of the crime.  She is the mother of three children and is an attorney.

### VIS Excerpt, Elenita Clariza[10]

I fear going to work when it's still dark - walking by myself especially in the morning.  Feeling unsafe now thinking that someone out there is waiting for me by my car to come and get me!

Being victim of a violent crime is a big impact to me and my family.  Now were always fearful.  It changed how a look at things and my surroundings!!!

The feeling of being carefree - feeling safe and secured is gone.  Wherever I go, when walking by myself daylight or dark - I have a fear always that the person coming towards me is someone who will hurt me.

### VIS Excerpt, Bien-Elize Roque

Personally, being that this crime happened to me when I was 11, it affected my entire world.  At age 11, my world was shattered and all feelings of security, safety, and childhood were obliterated by this crime.  At a young age, I learned a new fear of men that was never present before the incident. I was and am still, very paranoid, constantly checking the locks in our house, while I drive, and suspicious of every one - especially men.  I continue to be afraid of walking alone, whether it is during the day or night, and I battle with these constant feelings of fear.

My innocence and childhood were disrupted at a young age, which transferred into feelings of anger towards those who kidnapped us and feeling incredibly vulnerable and victimized throughout my adult life. All the negative affects of losing one's rights have occurred in my life; including lacking trust in people outside of my immediate family as well as paranoia.

As far as how this has affected those around me, people have noticed my paranoia and issues with fear.  But mostly, I have had to deal with these effects alone or with my family because frankly, not many people can relate.  Many people still live fearless and can not fathom anything dangerous happening to them, while I can

---

[10]    At the time of the crime, Ms. Clariza went by the name Elenita Dayao.  She is the sister of Helen Roque.  She was born in Manila, arrived in the U.S. in September 1974, became a naturalized U.S. citizen in approximately 1980, and was a U.S. citizen at the time she was a hostage.  She has two children and currently lives in the United States.

imagine a plethora of indescribable things that could happen to me just if I walk to my car alone at night. It has been a continuous battle with myself, my heart, and my confidence and I know it will continue to be.  I will never have the chance to reclaim my childhood and be free of this, so it's something I have just had to deal with.  The incident may have only lasted 5 days, but its effects are infinite.

### VIS Excerpt, Gloria Tagarro Galindez

I feared very dark nights, experienced flashbacks, exaggerated startled responses almost every minute or 2, loss of trust in my children's and my safety and security at all times.

### VIS Excerpt, Helen Roque

When we came back home, we did not know how to start over. . . . We had nightmares every night.  We were confused why it happened to us.  My husband was not able to hold a job after the kidnapping; he could no longer handle stress.  My daughter lost her innocence of the world.  She lost the smile, the laughter and the twinkle in her eyes that she once had. My daughter was never the same.  She became an angry person.  She was so traumatized that when she gets upset, she hyperventilates and she could not breathe. I, on the other hand, lost my sense of freedom.  I am overly cautious, afraid that anything could happen to me anywhere and anytime.  I am afraid of mountainous places; I don't like to be in a place that there are not a lot of people and I do not trust people I do not know.  Before going anywhere, I had to research how to get there, what the area is like, how many miles before we get to the location, is it mountainous. I get nervous when I am no longer familiar with the place and overly suspicious of people around me because I do not know who my enemies are.

### VIS Excerpt, Chrys San Gabriel[11]

This kidnapping incident had direct and indirect effects on me.  Direct effects are nightmares or flashbacks of the incident every now and then.  I remember there were times where I would wake up and feel a sense of hopelessness (this happened a few months

---

[11]     Chrys Lyle San Gabriel was a hostage, although not a U.S. citizen.  He is the son of Gloria San Gabriel.  He was 9 years old at the time.

after the incident and I would have nightmares once or twice a week), I would be restless, have fast palpitations of the heart, and it would take me a long time to get back to sleep. This incident led me to be easily overwhelmed when I encounter stressful situations in my life which eventually developed into anxiety. Many years later, I was diagnosed by the doctor and was prescribed an anti anxiety medication. When the crime happened I was nine turning 10, I lost my sense of innocence and I lost trust with the people around me except my family. The indirect effects are my father, Noel San Gabriel and my mother Gloria Galindez developed PTSD (where my mom would years later be diagnosed, while my father wasn't). This proved difficult for the family when months later after the incident we moved from the Philippines to America in 1996.

### VIS Excerpt, V.L.

My family thereafter avoided going to the countryside for fear of being held hostage again. We became unreasonably cautious in everything and anyway. Most if not always, I saw what is good in other people but said kidnapping incident changed my views. I am now on guard in the motives of people dealing with me.

My husband became so over protective of his family, to the extent, at first, of not going to work as he feared something bad might happen if he leaves his wife and children on their own. He had the belief that the kidnappers who survived the military pursuit and assault, might vent their ire on us. He was only prevailed upon and went to work when a 24 hour security by civilian volunteers of our local government will be provided us every time he leaves the house, in addition to the hired body guards, imposed upon us and fearing for our lives, we acceded. We shouldered all expenses of supporting all these people.

### C.    Damage Manifested in Myriad Ways

The damage which has occurred manifests itself in a myriad of ways.

The financial impact was far reaching.

### VIS Excerpt, V.L.

My family suffered so much financial constraints after said incident. My husband and I only earned a meager income, with

one college student studying in another city, Davao City.  The only savings we had before the incident were all given to the kidnappers.  I had to secure loans from friends and relatives without any visible means of payment unless I sell the inherited properties of my husband.

### VIS Excerpt, Helen Roque

When we came back home, we did not know how to start over. We owed family and friends money in order to pay for the ransom.  My husband and I had to come up with $30,000, to pay back the ransom that we had to pay the terrorists.

Defendant's actions literally tore families apart.

### VIS Excerpt, Gloria Tagarro Galindez

We were still in Manila when I received news that my father died. I have decided to go home alone for fear that we may be kidnapped again . . . .  I thought to myself that it would be best if I get kidnapped alone rather than my whole family again.  And there during the wake, bits and pieces of rumors I heard from friends and/or relatives was that I was being blamed for why the Roques, were kidnapped along with us.  I also observed how my sister had to stay strong for her family and had dealt with having to have bodyguards for their whole family.  I felt ashamed and embarrassed when one of the supposedly respectable visitors to the wake "jokingly" said aloud that my then husband was a coward and afraid of being kidnapped again for not accompanying me to my father's wake and burial for emotional support. . . .

It was not until my family and I arrived here in the US that I confirmed that the bits and pieces of the rumors of the Clariza (maiden name of Helen Roque) and the Roque families had the joint consensus that I was indeed to be blamed for why their relatives got kidnapped with us.  I got a threatening letter to be sued thereafter if I did not accede to their demand of paying up and was signed by the very people whom I thought will be mine and my family's support group here in the US.  I felt DEVASTATED, FRUSTRATED, THREATENED, AND HELPLESS. I thought to myself why I should be blamed for this, I was just HOSPITABLE to them and we suffered the same fate. I didn't know where and who to turn to for help. I was pregnant, starting a new life here with my family. I felt being kidnapped all over again and lost and

grieved for the loss of my friendship with Helen Roque whom I considered my best friend.

I gave birth to my youngest, and eventually the undiagnosed and without therapeutic help for my PTSD led to my having post-natal depression which further complicated things for me to be a suitable support for my husband and son who were both adjusting to a new culture and who themselves were suffering from PTSD as well. My then husband and I eventually separated after trying to fix the marriage tainted with PTSD from both sides without professional help.  Eventually, years later divorced. . . .

I remember while on a week-end trip with my ex-boyfriend to the mountains in the Yuba Area here in CA, USA that I was yelling and screaming at him because he wanted me to go beside this stream of water and I was just so afraid to go near it. . .  Eventually my boyfriend and I separated because he could no longer understand and stand my roller coaster emotions of rage, depression and too much irritability to the slightest perceived offenses towards me.

The crime fundamentally altered the victims hopes and dreams for the future.

## VIS Excerpt, Chrys San Gabriel

[W]e moved from the Philippines to America in 1996.  In America, we experienced hardships, the terrorist took my mom's savings so we were forced to be poor and be on welfare. . . .

In 2004, my mom took me and I went back with her to the States. By this time I think she was recently diagnosed with PTSD after her years of suffering with no psychological help whatsoever. Since my mom has PTSD and since she did not have any partner to help her I was forced to grow up fast and be the only man of the house (even though I was only 17 and had no idea about life in the States and no idea how to be an adult).  When I arrived in 2004, I was supposed to attend a university and pursue and finish the nursing program but since my mom has PTSD, I was not able to attend a university because I can not afford being away from my mom and brother where I can't support them.  So I attended a local community college and literally had to start from scratch with my college education because the California community colleges do not accept foreign college transcripts while the university does.  I

had to divide my time and effort between my family, school, and taking care of whatever I needed to do at home. I became the full time guardian for my brother where I take care of him every single day. I also became my mom's pillar of emotional strength where I try to support her emotionally and try to be understanding of her because of her PTSD. If she did not have PTSD and was still the same mother that I used to know before the crime, then none of this would have ever happened. I would have graduated in the year 2008 and I would have become a registered nurse where I could have been an asset to the American society as an operating room nurse and I would have earned around $500,000 dollars. But it seems that I will graduate in December of 2012, two years from now. Again I blame the Abu Sayyaf for this. So the direct and indirect effects on me and my family are still felt today, even though this crime happened 15 years ago, we still feel the effects and it still haunts us to this day.

### D.    <u>Restitution</u>

Under the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771, a crime victim has the "right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6). The Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3663A, requires the sentencing court to order restitution to the victims of defendants who are convicted of certain enumerated crimes. <u>See</u> 18 U.S.C. § 3663A(a)(1). In particular, the MVRA makes restitution a mandatory part of the sentence for a defendant convicted of a crimes of violence as defined in 18 U.S.C. § 16, in which an identifiable victim or victims has suffered a physical injury or pecuniary loss. 18 U.S.C. § 3663A(c)(1)(A).

Defendant Haipe pleaded guilty to four counts of Hostage Taking in violation of 18 U.S.C. § 1203. One commits the offense of Hostage Taking if, *inter alia*, one "seizes or detains or threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained." 18 U.S.C. § 1203(a). In turn, 18

U.S.C. § 16(a) provides that a "crime of violence" means "an offense that has as an element the

use, attempted use, or threatened use of physical force against the person . . ."  Hostage Taking is

unquestionably a crime of violence under the MVRA.

For purposes of the MVRA, the term "victim" means "a person directly and proximately

harmed as a result of the commission of an offense for which restitution may be ordered

including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern

of criminal activity, any person directly harmed by the defendant's criminal conduct in the course

of the scheme, conspiracy, or pattern."  18 U.S.C. § 3663A(2).  Moreover, "the district court may

order restitution without regard to whether the conduct that harmed the victim was conduct

underlying the offense of conviction."  United States v. Acosta, 303 F.3d 78, 86-87 (1st Cir.

2002); see also United States v. Karam, 201 F.3d 320, 325-326 (4th Cir. 2000) ("Federal courts

may order restitution encompassing losses resulting from a criminal scheme 'regardless of

whether the defendant is convicted for each criminal act within the scheme,' so long as the loss is

a direct result of the defendant's criminal conduct or is 'closely related to the scheme'").

The MVRA requires that "[i]n each order of restitution, the court shall order restitution to

each victim in the full amount of each victim's losses as determined by the court and without

consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A).  In

addition, "[i]n no case shall the fact that a victim has received or is entitled to receive

compensation with respect to a loss from insurance or any other source be considered in

determining the amount of restitution."  Id. § 3664(f)(1)(B).  Under the MVRA, a district court

considers the defendant's financial circumstances only in specifying the manner and schedule of

payments. See id. § 3664(f)(2).[12]

The purpose of the MVRA is, "to the extent possible, to make victims whole, to fully compensate victims for their losses, and to restore victims to their original state of well-being." United States v. Smith, 297 F. Supp. 69, 72 (D.D.C. 2003) (citing United States v. Simmonds, 235 F.3d 826, 831 (3d Cir.2000)). Moreover, the MVRA instructs the district court to assess the victim's restitution based on the amount of actual loss that the defendant has caused to the victim. Id. (citations omitted). In calculating the amount, a sentencing court is not held to a standard of absolute precision. United States v. Innarelli, 524 F.3d 286, 294 (1st Cir. 2008). A "modicum of reliable evidence" will suffice. United States v. Vaknin, 112 F.3d 579, 587 (1st Cir. 1997).

Helen Roque, Elenita Dayao (now Elenita Clariza), Bien-Elize Roque (who was then a minor) and Gloria San Gabriel (now Gloria Galindez) were the named victims of Counts Two, Three, Four and Five, respectively. Each of these victims has submitted a VIS. Helen Roque and Bien-Elize Roque have previously submitted loss information to the government through the International Terrorism Victim Expense Reimbursement Program (ITVERP).[13] To date, they have not received any reimbursement. Elenita Clariza did not provide the basis for any restitution amount in her VIS. Gloria Galindez has claimed a total loss of $732,538.46, broken down as follows: $11,538.46 for her share of the ransom; $7,000.00 in Philippine medical expenses; $30,000 in U.S. medical expenses and alternative care for Post-Traumatic Stress

---

[12]     Paragraph 1 of the Plea Agreement informed defendant that the Court may order him to make reasonable restitution to the victims.

[13]     ITVERP is offered by the United States Department of Justice, Office of Justice Programs. Should Helen Roque or Bien-Elize Roque receive any amount of reimbursement through ITVERP prior to sentencing, the government will inform the court accordingly. As noted in the MVRA, "[i]f a victim has received compensation from insurance or any other source with respect to loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation." 18 U.S.C. § 3664(j)(1).

Disorder; $330,000.00 in alleged lost wages; and $24,000.00 in alternative care.  She did not provide any documentation for her claims.

In addition to the four named victims, there were 12 other individuals who were taken hostage during the same offense, each of whom was directly and proximately harmed by defendant Haipe's offense, and therefore each of whom is defined as a victim under both the MVRA, 18 U.S.C. § 3663A(a)(2), and under the CVRA, 18 U.S.C. § 3771(e).  These include Nelson Roque, Chrys San Gabriel, V.L. (whose initial are used because of safety concerns) and nine other Philippine hostages.  Chrys San Gabriel submitted a VIS and has claimed $506,000 in alleged lost wages.  He did not provide any supporting documentation for his claims.  V.L. submitted a VIS and claimed a total loss of $15,09.53 (U.S. dollars), broken down as follows: $7,023.81 in ransom paid; $238.10 in medical expenses for the treatment of her children (who were also victims) for three months, due to traumatic asthma; $476.19 in lost wages; and $7,571.42 in other itemized miscellaneous expenses.  She did not provide any documentation in support of her claims.  The victims have provided the government with some bank records and other documentation of ransom money paid in this case, examples of which are attached as **Exhibit J**.

We expect that the four named U.S. victims, as well as Chrys San Gabriel and V.L., will be present at the time of defendant's sentencing should the Court need to hear from them directly concerning the amount of money they seek for restitution.

## Conclusion

The defendant committed crimes of terrorism against unarmed men, women, and

children.  The best evidence of the brutality of the crime is found in the victim impact statements.

This is a crime that will never be forgotten.  A sentence of 25 years is appropriate, fair, and just

under the totality of the circumstances in this case.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney
D.C. Bar No. 447889


By:      /s/
GREGG A. MAISEL
D.C. Bar No. 447902
(202) 252-7812
Gregg.Maisel@usdoj.gov

ANTHONY ASUNCION
D.C. Bar No. 420822
(202) 252-7786
Anthony.Asuncion@usdoj.gov

Assistant United States Attorneys
National Security Section
555 Fourth Street, N.W.  (11th Floor)
Washington, D.C.  20530

T.J. REARDON, III
D.C. Bar No. 141903
Senior Trial Attorney
Counterterrorism Section/National Security Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C.  20530
(202) 514-1083
T.J.ReardonIII@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the "Government's Sentencing Memorandum" was served via ECF on counsel for the defendant, Tony W. Miles, Assistant Federal Public Defender, on this 3rd day of December, 2010.

<u>/s/</u>
GREGG A. MAISEL
ASSISTANT UNITED STATES ATTORNEY